**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BRYAN BURSTELL, Derivatively and on Behalf of CHARGEPOINT HOLDINGS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>PASQUALE ROMANO, REX S. JACKSON, RICK WILMER, ROXANNE BOWMAN, ELAINE L. CHAO, BRUCE CHIZEN, AXEL HARRIES, JEFFREY HARRIS, SUSAN HEYSTEE, MARK LESCHLY, MICHAEL LINSE, EKTA SINGH-BUSHELL, G. RICHARD WAGONER, JR.,<br><br>Defendants,<br><br>and,<br><br>CHARGEPOINT HOLDINGS, INC,<br><br>Nominal Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Bryan Burstell ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant ChargePoint Holdings, Inc. ("ChargePoint" or the "Company"), files this Shareholder Derivative Complaint against Pasquale Romano ("Romano"), Rex S. Jackson ("Jackson"), Rick Wilmer ("Wilmer"), Roxanne Bowman ("Bowman"), Elaine L. Chao ("Chao"), Bruce Chizen ("Chizen"), Axel Harries ("Harries"), Jeffrey Harris ("Harris"), Susan Heystee ("Heystee"), Mark Leschly ("Leschly"), Michael Linse ("Linse"), Ekta Singh-Bushell ("Singh-Bushell"), and G. Richard Wagoner, Jr. ("Wagoner") (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of ChargePoint.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ChargePoint, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California captioned *Khan v. ChargePoint Holdings, Inc. et al.*, No. 23-cv-06172 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action brought in the right, and for the benefit, of ChargePoint against certain of its officers and directors (the "Board") seeking to remedy Defendants' violations of law that have occurred from December 7, 2021 to November 16, 2023 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to ChargePoint and its shareholders, including monetary losses and damages to ChargePoint's reputation and goodwill.

2. ChargePoint is a provider of networked electric vehicle charging solutions, including charging hardware and the ChargePoint cloud subscription platform. The Company represents that its products and services are designed to support a broad range of charging use cases, including residential, workplace, parking, hospitality, retail, and transportation fleet

environments.

3. Throughout the Relevant Period, the Company issued a series of press releases and filings with the SEC that portrayed its financial performance and prospects in a consistently positive light. These statements, however, were materially false and misleading because they omitted material facts concerning the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) a material portion of ChargePoint's reported revenue was derived from undisclosed practices that violated GAAP and the Company's own revenue recognition policy, including unauthorized shipments to customers who had not approved delivery, shipments of incomplete or non-functioning products, channel stuffing through resellers by means of coercion and undocumented side deals and rebates, and premature software token activations; (2) as a result, ChargePoint's reported revenue growth was not attributable to organic customer demand and was unsustainable; (3) ChargePoint was incurring elevated component costs and supply overruns associated with its first-generation direct current ("DC") charging products; (4) as a result, the Company was likely to incur impairment charges; (5) these conditions were adversely impacting, and were reasonably likely to continue adversely impacting, ChargePoint's profitability; and (6) ChargePoint maintained deficient internal controls. Consequently, Defendants' statements concerning the Company's business, operations, and prospects were materially false and misleading when made and lacked a reasonable basis.

4. The truth began to emerge on September 6, 2023, when the Company issued a press release disclosing that it had recorded a $28 million inventory impairment charge, which ChargePoint acknowledged was "taken to address legacy supply chain-related costs and supply overruns on a particular DC product." As a result of these issues, the Company reported that its quarterly GAAP gross margin "was 1%, down from 17% in the prior year's same quarter, and

non-GAAP gross margin was 3%, down from 19% in the prior year's same quarter." This disclosure revealed the adverse impact that the previously undisclosed component cost increases and supply overruns were having on the Company's financial performance.

5. On this news, ChargePoint's stock price declined approximately 11% in a single trading day, closing at $6.29 per share on September 7, 2023.

6. On November 16, 2023, ChargePoint filed a Form 8-K with the SEC attaching two press releases. The Company disclosed that Defendant Romano, ChargePoint's President and Chief Executive Officer ("CEO"), and Defendant Jackson, ChargePoint's Chief Financial Officer ("CFO"), were departing the Company effective immediately. ChargePoint also disclosed a $42 million inventory impairment charge "related to product transitions and to better align inventory with current demand," which resulted in projected "GAAP gross margin of negative 23% to negative 21% and non GAAP gross margin of negative 19% to negative 17%."

7. On this news, ChargePoint's stock price declined approximately 35% in a single trading day, closing at $2.02 per share on November 17, 2023.

8. As a result of the Individual Defendants' misconduct, ChargePoint, Defendant Romano, and Defendant Jackson (among others) were named as defendants in the Securities Action by investors who allege they were damaged when they purchased ChargePoint shares during the Relevant Period. On May 21, 2026, the Honorable Noel Wise issued an order denying the Securities Action defendants' Motion to Dismiss. *See* Order Denying Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint, *Khan V. ChargePoint Holdings, Inc. et al.*, 23-cv-06172 (N.D. Cal.) (ECF No. 162) (the "Order").

9. The Securities Action has subjected ChargePoint to significant costs and burdens, including the need to conduct internal investigations, evaluate and implement adequate internal

controls, defend against the litigation, and address substantial potential liability arising from the alleged wrongdoing.

10. Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of ChargePoint, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Action, a majority of ChargePoint's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Action based on violations of the Exchange Act.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

13. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391(b)(1) because ChargePoint is incorporated in this District and a substantial

portion of the wrongful conduct alleged herein occurred in this District, including the preparation, issuance, and dissemination of materially false and misleading statements and omissions concerning the Company's business, operations, and prospects.

## PARTIES

### Plaintiff

16. Plaintiff is, and has been at all relevant times, a shareholder of ChargePoint.

### Nominal Defendant

17. Nominal Defendant ChargePoint is incorporated under the laws of Delaware, with its principal executive office located at 240 East Hacienda Avenue, Campbell, CA 95008. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CHPT."

### Director Defendants

***Defendant Wilmer***

18. Defendant Wilmer has served as ChargePoint's President, Chief Executive Officer ("CEO"), and a member of the Board since November 16, 2023. Prior to his appointment as CEO, Defendant Wilmer served as the Company's Chief Operating Officer ("COO") from around December 2022 through November 2023, and as the Company's Chief Customer and Operations Officer after joining ChargePoint on or around July 2022.

19. The Company's 2026 Proxy Statement stated the following about Defendant Wilmer:

> *Richard "Rick" Wilmer* has served as President and Chief Executive Officer and a member of the Board of Directors for ChargePoint since November 2023. Prior to November 2023, Mr. Wilmer served as Chief Operating Officer from December 2022 until November 2023 and as Chief Customer and Operations Officer after joining ChargePoint in July 2022. Prior to joining ChargePoint, Mr. Wilmer served as the Head of Chowbotics at DoorDash, Inc., a company that operates an online

food ordering and food delivery platform, from February 2021 until July 2022. Previously, Mr. Wilmer served as Chief Executive Officer of Chowbotics, Inc., a manufacturer of a fresh food robot, from September 2019 until February 2021. Prior to Chowbotics, Inc., Mr. Wilmer served as Chief Executive Officer of Mojo Networks, a provider of cloud-managed wireless networking, from December 2014 until the acquisition of Mojo Network, Inc. by Arista Networks in August 2018, and following such acquisition, as the General Manager of Arista Networks, Inc.'s Wi-Fi business until September 2019. With more than 30 years of global technology, operations and customer support experience, Mr. Wilmer has global operations experience across North America, Europe and Asia and industry knowledge across multiple technology segments as well as overseas manufacturing and supply chain management. Mr. Wilmer holds a Bachelor of Science in Chemistry from the University of California, Berkeley. We believe Mr. Wilmer is qualified to serve as a member of our Board based on his wide-ranging experience in global operations and manufacturing, management, sales, customer support, executive leadership and strategic planning.

20. According to the Company's Proxy Statements filed with the SEC, Defendant Wilmer received $3,497,427, and $8,773,492 in total compensation from the Company in 2024 and 2023, respectively.

| Fiscal Year | Salary ($) | Stock Awards ($) | Non-Equity Incentive Plan Compensation ($) | Total ($) |
|---|---|---|---|---|
| **2024** | 521,875 | 2,975,552 | | 3,497,427 |
| **2023** | 232,628 | 8,444,186 | 96,678 | 8,773,492 |

21. As of April 30, 2023, Defendant Wilmer beneficially owned 64,589 shares of ChargePoint common stock, and by April 30, 2024, Defendant Wilmer beneficially owned 194,778 shares of the Company's common stock.

***Defendant Bowman***

22. Defendant Bowman has served as a member of ChargePoint's Board since around February 2021, previously served as director of Legacy ChargePoint since August 2019, and is currently a member of the Company's Nominating and Corporate Governance Committee.

23. The Company's 2026 Proxy Statement stated the following about Defendant Bowman:

> *Roxanne Bowman* has served as a member of ChargePoint's Board since February 2021 and previously served as a director of Legacy ChargePoint since August 2019. Ms. Bowman has served as Operating Executive at NMS Capital, a private investment firm, since March 2019. From September 2013 to November 2018, Ms. Bowman served as Chief Executive Officer of PowerTeam Services, LLC, a gas and electric utility service provider. Ms. Bowman holds a B.S. in Electrical Engineering from Clemson University and an M.B.A. from the Pamplin College of Business at Virginia Polytechnic Institute and State University. We believe Ms. Bowman is qualified to serve as a member of our Board based on her wide-ranging experience in management, sales, marketing and strategic planning within the utilities industry.

24. According to the Company's Proxy Statements filed with the SEC, Defendant Bowman received total compensation of $132,057, $202,349, and $227,459 during fiscal years 2022, 2023, and 2024, respectively.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| **2024** | 40,000 | 187,459 | 227,459 |
| **2023** | 40,000 | 162,349 | 202,349 |
| **2022** | 40,000 | 92,057 | 132,057 |

25. As of April 30, 2022, Defendant Bowman beneficially owned 252,048 shares of ChargePoint common stock, and as of April 30, 2023, Bowman beneficially owned 342,444. By April 30, 2024, Defendant Bowman beneficially owned 377,805 shares of ChargePoint common stock.

***Defendant Chao***

26. Defendant Chao served as a member of ChargePoint' Board from around November 2021 until around July 2026.

27. The Company's 2025 Proxy Statement stated the following about Defendant Chao:

> *Elaine L. Chao* has served as a member of ChargePoint's Board since November 2021. Ms. Chao served as the U.S. Secretary of Transportation from January 2017 to January 2021 and the U.S. Secretary of Labor from January 2001 to January 2009. Ms. Chao has served as a director for numerous public companies and currently serves as a director for The Kroger Co., since August 2021 and Mobileye Global, Inc., since June 2024. Ms. Chao served as a director for Hyliion Holdings Corp from August 2021 to March 2023 and for Embark Technology, Inc. from March 2021 to August 2023. Ms. Chao holds a bachelor's degree in economics from Mount Holyoke College and a Master in Business Administration from the Harvard Business School. We believe that Ms. Chao is qualified to serve as a member of our Board based on her experiences in the public, private and nonprofit sectors, extensive public policy experience and her extensive public company board service.

28. According to the Company's Proxy Statements filed with the SEC, Defendant Chao received total compensation of $425,236, $202,349, and $227,459 during fiscal years 2022, 2023, and 2024, respectively.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| **2024** | 40,000 | 187,459 | 227,459 |
| **2023** | 40,000 | 162,349 | 202,349 |
| **2022** | 10,000 | 415,236 | 425,236 |

29. As of April 30, 2023, Chao beneficially owned 5,423 shares of ChargePoint common stock.

***Defendant Chizen***

30. Defendant Chizen has served as a member of ChargePoint's Board since February 2021 (and previously as a director of Legacy ChargePoint since December 2014) and has served as Chair of the Board since 2021 and is currently a member of the Company's Compensation and Organizational Development Committee.

31. The Company's 2026 Proxy Statement stated the following about Defendant Chizen:

> *Bruce Chizen* has served as a member of ChargePoint's Board since February 2021 and previously served as a director of Legacy ChargePoint since December 2014. Mr. Chizen is currently an independent consultant and has served as Senior Adviser to Permira Advisers LLP, a private equity fund, since July 2008, and as a Venture Partner at Voyager Capital, a venture capital firm, from August 2009 through May 2023. He has also served as an Operating Partner for Permira Growth Opportunities, a private equity fund since June 2018. From 1994 until 2008, Mr. Chizen served in a number of positions at Adobe Systems Incorporated, a provider of design, imaging and publishing software, including as its Chief Executive Officer from 2000 to 2007, President from 2000 to 2005, acting Chief Financial Officer from 2006 to 2007 and Strategic Advisor from 2007 to 2008. Mr. Chizen currently serves as a director of Synopsys, Inc. since April 2001 and Oracle Corporation since July 2008. Mr. Chizen previously served as a director of Informatica Inc. from August 2015 until November 2025. Mr. Chizen holds a bachelor's degree from Brooklyn College, City University of New York. We believe Mr. Chizen is qualified to serve as a member of our Board based on his extensive executive leadership experience in digital media and software.

32. According to the Company's Proxy Statements filed with the SEC, Defendant Chizen received total compensation of $162,057, $232,349, and $257,459 during fiscal years 2022, 2023, and 2024, respectively.

| **Fiscal Year** | **Fees Earned or Paid in Cash ($)** | **Stock Awards ($)** | **Total ($)** |
|---|---|---|---|
| **2024** | 70,000 | 187,459 | 257,459 |
| **2023** | 70,000 | 162,349 | 232,349 |
| **2022** | 70,000 | 92,057 | 162,057 |

33. As of April 30, 2022, Defendant Chizen beneficially owned 1,122,380 shares of ChargePoint common stock, and as of April 30, 2023, Chizen beneficially owned 1,096,927. By April 30, 2024, Defendant Chizen beneficially owned 1,701,845 shares of ChargePoint common stock.

***Defendant Harries***

34. Defendant Harries has served as a member of ChargePoint's Board since February 2021.

35. The Company's 2026 Proxy Statement stated the following about Defendant Harries:

> *Axel Harries* has served as a member of ChargePoint's Board since February 2021 and previously served as a director of Legacy ChargePoint since October 2016. Mr. Harries has served as Head of Global Customer Service and Parts for Mercedes-Benz AG, an automotive manufacturing and supply company, since May 2023. Prior to this, since June 1993, Mr. Harries held several roles at Mercedes-Benz AG, including Vice President of Product Management and Sales from June 2017 to May 2023, leading the Connected, Autonomous, Shared & Services and Electric Drive unit, which is responsible for all-electric vehicle architecture from July 2016 to June 2017, leading Quality Management of Mercedes-Benz Cars from July 2014 to July 2016 and Head of the G-Wagon Business Unit at Mercedes-Benz Cars from July 2008 to June 2014. Mr. Harries studied product engineering with finance and management accounting at Furtwangen University, Germany. We believe Mr. Harries is qualified to serve as a member of our Board based on his extensive management experience in the automotive industry and knowledge of Europe's auto charging market.

36. According to the Company's Proxy Statements filed with the SEC, Defendant Harries received total compensation of $659,307, $202,349, and $227,459 during fiscal years 2022, 2023, and 2024, respectively.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| **2024** | 40,000 | 187,459 | 227,459 |
| **2023** | 40,000 | 162,349 | 202,349 |
| **2022** | 40,000 | 619,307 | 659,307 |

37. As of April 30, 2022, Defendant Harries beneficially owned 18,500 shares of ChargePoint common stock, and as of April 30, 2023, Harries beneficially owned 21,692. By April 30, 2024, Defendant Harries beneficially owned 35,255 shares of ChargePoint common stock.

***Defendant Harris***

38. Defendant Harris has served as a member of ChargePoint's Board since February 2021 and currently is the Chair of the Company's Audit Committee.

39. The Company's 2026 Proxy Statement stated the following about Defendant Harris:

> *Jeffrey Harris* has served as a member of ChargePoint's Board since February 2021 and previously served as a director of Legacy ChargePoint since December 2018. In 2012, Mr. Harris founded Global Reserve Group LLC, a financial advisory and investment firm focused primarily on the energy and technology industries. In addition, he has been a Venture Partner of Quantum Energy Partners, a private equity firm focused on the energy industry, since 2012. Previously, Mr. Harris was a managing director of Warburg Pincus LLC, a private equity firm, from 1983 until 2011. Mr. Harris served as a director of Knoll, Inc., until July 2021 and of InterPrivate II Acquisition Corp., until December 2022. Mr. Harris holds a B.S. in Economics from the Wharton School of the University of Pennsylvania and an M.B.A. from Harvard Business School. We believe Mr. Harris is qualified to serve as a member of our Board based on his extensive financial expertise and knowledge of the energy industry and clean technology.

40. According to the Company's Proxy Statements filed with the SEC, Defendant Harris received total compensation of $679,307, $222,349, and $247,459 during fiscal years 2022, 2023, and 2024, respectively.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| **2024** | 60,000 | 187,459 | 247,459 |
| **2023** | 60,000 | 162,349 | 222,349 |
| **2022** | 60,000 | 619,307 | 679,307 |

***Defendant Heystee***

41. Defendant Heystee has served as a member of ChargePoint's Board since May 2021 and is currently a member of the Company's Audit Committee and the Compensation and Organizational Development Committee.

42. The Company's 2026 Proxy Statement stated the following about Defendant Heystee:

> *Susan Heystee* has served as a member of ChargePoint's Board since May 2021. From January 2017 to June 2018, Ms. Heystee was Senior Vice President of Global Automotive Business at Verizon Connect, a fleet management solutions software company. Prior to Verizon Connect, Ms. Heystee served as Executive Vice President of Global Sales and OEM Business at Telogis, Inc., which was acquired by Verizon in July 2016, from February 2010 to December 2016. Ms. Heystee has served as a director of Ouster, Inc. since September 2018. Ms. Heystee holds Bachelor's degrees in mathematics and business from the University of Waterloo and has completed the Advanced Management Program at Harvard Business School. We believe that Ms. Heystee is qualified to serve as a member of our Board of Directors due to her extensive experience in the technology sector and knowledge of market driven strategies.

43. According to the Company's Proxy Statements filed with the SEC, Defendant Heystee received total compensation of $335,986, $202,349, and $227,459 during fiscal years 2022, 2023, and 2024, respectively.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| **2024** | 40,000 | 187,459 | 227,459 |
| **2023** | 40,000 | 162,349 | 202,349 |
| **2022** | 30,000 | 305,986 | 335,986 |

44. As of April 30, 2022, Defendant Heystee beneficially owned 16,526 shares of ChargePoint common stock, and as of April 30, 2023, Heystee beneficially owned 20,553. By April 30, 2024, Defendant Heystee beneficially owned 38,143 shares of ChargePoint common stock.

***Defendant Leschly***

45. Defendant Leschly has served as a member of the Board since February 2021 (and previously as a director of Legacy ChargePoint since December 2009) and is currently a member of the Company's Compensation and Organizational Development Committee and Chair of the Nominating and Corporate Governance Committee.

46. The Company's 2026 Proxy Statement stated the following about Defendant Leschly:

> *Mark Leschly* has served as a member of ChargePoint's Board since February 2021 and previously served as a director of Legacy ChargePoint since December 2009. Since July 1999, Mr. Leschly has served as a managing partner of Rho Capital Partners, Inc., an investment and venture capital management company. Since 2017, Mr. Leschly has been the chairman and chief executive officer of Universal Tennis, LLC, which is the developer of a software platform for tennis analytics and tournament management. Since 2014, Mr. Leschly has also been the owner and managing member of Iconica LLC, which primarily focuses on investments at the intersection of sports, media and technology. Mr. Leschly served as a director of NGM Biopharmaceuticals, Inc. from January 2008 to May 2022. Mr. Leschly holds an M.B.A. from Stanford Graduate School of Business and a B.A. from Harvard University. We believe Mr. Leschly is qualified to serve as a member of our Board based on his extensive experience in corporate finance and investing in energy companies.

47. According to the Company's Proxy Statements filed with the SEC, Defendant Leschly received total compensation of $608,662, $210,349, and $235,459 during fiscal years 2022, 2023, and 2024, respectively.

| **Fiscal Year** | **Fees Earned or Paid in Cash ($)** | **Stock Awards ($)** | **Total ($)** |
|---|---|---|---|
| **2024** | 48,000 | 187,459 | 235,459 |
| **2023** | 48,000 | 162,349 | 210,349 |
| **2022** | 48,000 | 560,662 | 608,662 |

48. As of April 30, 2022, Defendant Leschly beneficially owned 439,446 shares of ChargePoint common stock, and as of April 30, 2023, Leschly beneficially owned 442,638. By April 30, 2024, Defendant Leschly beneficially owned 456,201 shares of ChargePoint common stock.

***Defendant Linse***

49. Defendant Linse has served as a member of the Board since February 2021 (and previously as a director of Legacy ChargePoint since April 2012) and is currently the Chair of the Company's Compensation and Organizational Development Committee.

50. The Company's 2026 Proxy Statement stated the following about Defendant Linse:

> *Michael Linse* has served as a member of ChargePoint's Board since February 2021 and previously served as a director of Legacy ChargePoint since April 2012. Mr. Linse has served as the Founder and Managing Director of Linse Capital LLC since October 2015, a growth equity firm investing in late-stage technology companies, and Levitate Capital, a venture capital firm, since March 2017. Prior to founding Linse Capital, Mr. Linse served as a partner at Kleiner Perkins Caufield & Byers ("KPCB") from 2008 until March 2016. Prior to joining KPCB, Mr. Linse worked at Goldman Sachs for over a decade, most recently as Managing Director of the alternative energy investing team. Mr. Linse previously served as a director of Valens Semiconductor Ltd from 2018 until August 2025. Mr. Linse holds a B.A. in Economics from Harvard University and an M.B.A. from Harvard Business School. We believe Mr. Linse is qualified to serve as a member of our Board based on his extensive experience in corporate finance and investing in the alternative energy space.

51. According to the Company's Proxy Statements filed with the SEC, Defendant Linse received total compensation of $674,307, $217,349, and $242,459 during fiscal years 2022, 2023, and 2024, respectively.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| **2024** | 55,000 | 187,459 | 242,459 |
| **2023** | 55,000 | 162,349 | 217,349 |
| **2022** | 55,000 | 619,307 | 674,307 |

52. As of April 30, 2022, Defendant Linse beneficially owned 69,445,565 shares of ChargePoint common stock, representing approximately 19.9% of the Company's outstanding common stock, and as of April 30, 2023, Defendant Linse beneficially owned 34,729,970 shares, representing approximately 9.5% of the Company's outstanding common stock. By April 30,

2024, Defendant Linse beneficially owned 11,590,946 shares, representing approximately 2.7% of ChargePoint's outstanding common stock.

***Defendant Singh-Bushell***

53. Defendant Singh-Bushell has served as a member of the Board since April 2022 and is currently a member of the Company's Audit Committee

54. The Company's 2026 Proxy Statement stated the following about Defendant Singh-Bushell:

> *Ekta Singh-Bushell* has served as a member of ChargePoint's Board since April 2022. From May 2016 to June 2017, Ms. Singh-Bushell served as deputy to the first vice president, chief operating officer executive office, at the Federal Reserve Bank of New York. Prior to 2016, Ms. Singh-Bushell worked at Ernst & Young, serving in various roles including global IT Effectiveness leader, U.S. innovation & digital strategy leader, and chief information security officer. Ms. Singh-Bushell has served as a director for numerous public companies including, Lesaka Technologies Inc., since October 2018. Ms. Singh-Bushell previously served as director of Designer Brands, Inc. from September 2018 to May 2022, of TTEC Holdings, Inc., from May 2017 to September 2024, of Cisco Systems, Inc. from June 2024 to December 2024 and of Huron Consulting Group, from May 2019 until May 2026. Ms. Singh-Bushell received her Master of Science in Electrical Engineering & Computer Science from the University of California, Berkeley and her undergraduate degree in engineering from the University of Poona, India. We believe that Ms. Singh-Bushell is qualified to serve as a member of our Board based on her operational experiences with finance, audit, technology and cybersecurity matters and her prior public company board service.

55. According to the Company's Proxy Statements filed with the SEC, Defendant Singh-Bushell received total compensation of $455,052, and $227,459 during fiscal years 2023, and 2024, respectively.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| **2024** | 40,000 | 187,459 | 227,459 |
| **2023** | 40,000 | 415,052 | 455,052 |

56. As of April 30, 2023, Singh-Bushell beneficially owned 5,710 and by April 30, 2024, Defendant Singh-Bushell beneficially owned 13,579 shares of ChargePoint common stock.

***Defendant Wagoner***

57. Defendant Wagoner has served as a member of the Board since February 2021 and is currently a member of the Company's Nominating and Corporate Governance Committee.

58. The Company's 2026 Proxy Statement stated the following about Defendant Wagoner:

> *G. Richard Wagoner, Jr.* has served as a member of ChargePoint's Board since February 2021 and previously served as a director of Legacy ChargePoint since February 2017. From 1977 to 2009, Mr. Wagoner held numerous senior positions at General Motors Corporation, including Chairman and Chief Executive Officer from 2003 to 2009. Mr. Wagoner currently serves as a director of Invesco Ltd., since October 2013, and Graham Holdings Inc., since June 2010. Mr. Wagoner holds a bachelor's degree from Duke University and an M.B.A. from Harvard Business School. We believe Mr. Wagoner is qualified to serve as a member of our Board based on his extensive experience in the automobile industry, general management experience and public company board service.

59. According to the Company's Proxy Statements filed with the SEC, Defendant Wagoner received total compensation of $600,662, $202,349, and $227,459 during fiscal years 2022, 2023, and 2024, respectively.

| **Fiscal Year** | **Fees Earned or Paid in Cash ($)** | **Stock Awards ($)** | **Total ($)** |
|---|---|---|---|
| **2024** | 40,000 | 187,459 | 227,459 |
| **2023** | 40,000 | 162,349 | 202,349 |
| **2022** | 40,000 | 560,662 | 600,662 |

60. As of April 30, 2022, Defendant Wagoner beneficially owned 486,452 shares of ChargePoint common stock, and as of April 30, 2023, Wagoner beneficially owned 499,501. By April 30, 2024, Defendant Wagoner beneficially owned 520,267 shares of ChargePoint common stock.

**Former Officer Defendants**

***Defendant Romano***

61. Defendant Romano served as the Company's President, CEO, and as a member of the Board from February 2011 until November 16, 2023. Romano is a named defendant in the Securities Action.

62. The Company's 2023 Proxy Statement stated the following about Defendant Romano:

> *Pasquale Romano* has served as President and Chief Executive Officer and a member of the Board for ChargePoint since February 26, 2021 and has held the same positions at Legacy ChargePoint since February 2011. Prior to ChargePoint, Mr. Romano co-founded 2Wire, Inc., a provider of broadband service delivery platforms, where he served as its President and Chief Executive Officer from October 2006 until July 2010 when 2Wire, Inc. was acquired by Pace plc. In 1989, he co-founded Fluent, Inc., a digital video networking company and served as its Chief Architect until the company was sold to Novell Corporation in 1993. In August 2022, Mr. Romano was appointed to President Biden's National Infrastructure Advisory Council which advises the White House on how to reduce physical and cybersecurity risks and improve the security and resilience of the nation's critical infrastructure sectors. Mr. Romano holds an A.B. in Computer Science from Harvard University and an M.S. from Massachusetts Institute of Technology. We believe Mr. Romano is qualified to serve as a member of our Board due to his extensive executive management, public policy, and technology industry leadership experience.

63. According to the Company's Proxy Statements filed with the SEC, Defendant Romano received total compensation of $58,679,085, $16,755,533, and $602,418 during fiscal years 2022, 2023, and 2024, respectively.

| Fiscal Year | Salary ($) | Stock Awards ($) | Non-Equity Incentive Plan Compensation ($) | Option Awards ($) | All Other Comp. ($) | Total ($) |
|---|---|---|---|---|---|---|
| **2024** | 595,833 | | | | 6,584 | 602,418 |
| **2023** | 562,500 | 15,748,311 | 431,250 | | 13,472 | 16,755,533 |
| **2022** | 500,000 | | | 43,823,305 | 14,355,780 | 58,679,085 |

64. As of April 30, 2022, Defendant Romano beneficially owned 7,213,706 shares of ChargePoint common stock, representing approximately 2.1% of the Company's outstanding common stock, and as of April 30, 2023, Defendant Romano beneficially owned 7,215,180 shares, representing approximately 2.0% of the Company's outstanding common stock. By April 30, 2024, Defendant Romano beneficially owned 6,153,861 shares, representing approximately 1.4% of ChargePoint's outstanding common stock.

***Defendant Jackson***

65. Defendant Jackson served as the Company's CFO from May 2018 until November 16, 2023.

66. The Company's 2023 Proxy Statement stated the following about Defendant Jackson:

> *Rex Jackson*. Mr. Jackson has served as Chief Financial Officer for ChargePoint since February 26, 2021 and has held the same position at Legacy ChargePoint since May 2018. Prior to ChargePoint, Mr. Jackson served as Chief Financial Officer of Gigamon, Inc., a developer of network and security visibility solutions, from October 2016 to April 2018 through its go-private transaction. Mr. Jackson served as Chief Financial Officer of Rocket Fuel Inc., an advertising technology company, from March 2016 to October 2016. Prior, Mr. Jackson served as Chief Financial Officer of JDS Uniphase Corporation ("JDSU"), a provider of network and service enablement solutions and optical products for service providers, cable operators and network equipment manufacturers, from January 2013 to September 2015, where he drove the separation of JDSU into two independent public companies (Lumentum Holdings Inc./Viavi Solutions) in August 2015. Mr. Jackson joined JDSU in January 2011 as Senior Vice President, Business Services, with responsibility for corporate development, legal, corporate marketing and information technology. Prior to JDSU, Mr. Jackson served as Chief Financial Officer of Symyx Technologies from 2007 to 2010, where he led the company's acquisition of MDL Information Systems and subsequent merger of equals with another public company. Previously, Mr. Jackson also served as acting Chief Financial Officer for Synopsys and General Counsel at Avago Technologies Limited (now Broadcom, Inc.), AdForce and Read-Rite. Mr. Jackson has served on the board of directors of EMCORE Corporation since December, 2015 and chairs the audit and compensation committees. Mr. Jackson previously served on the board of directors of Energous Corporation from 2014 to 2019. Mr. Jackson holds a B.A. from Duke University and a J.D. from Stanford Law School.

67. According to the Company's Proxy Statements filed with the SEC, Defendant Jackson received total compensation of $13,188,729, $8,541,031, and $702,319 during fiscal years 2022, 2023, and 2024, respectively.

| Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| **2024** | 411,197 | | | | 291,121 | 702,319 |
| **2023** | 425,000 | | 7,874,156 | 241,875 | | 8,541,031 |
| **2022** | 362,500 | 90,000 | 9,555,000 | | 3,181,229 | 13,188,729 |

68. As of April 30, 2022, Defendant Jackson beneficially owned 1,900,264 shares of ChargePoint common stock, and as of April 30, 2023, Defendant Jackson beneficially owned 2,005,430 shares. By April 30, 2024, Defendant Jackson beneficially owned 1,476,262 shares of ChargePoint common stock.

69. Defendants Romano, Jackson, Wilmer, Bowman, Chizen, Harries, Harris, Heystee, Leschly, Linse, Singh-Bushell, and Wagoner are collectively referred to herein as the "Individual Defendants."

70. Defendants Wilmer, Bowman, Chizen, Harries, Harris, Heystee, Leschly, Linse, Singh-Bushell, and Wagoner are collectively referred to herein as the "Director Defendants."

71. Defendants Romano, Jackson, Wilmer, Chizen, Linse, and Singh-Bushell are collectively referred to herein as the "Insider Selling Defendants."

72. Defendants Harris, Heystee, Non-Party Mitesh Dhruv, and Singh-Bushell are collectively referred to herein as the "Audit Committee Defendants."

73. Defendants Bowman, Leschly, and Wagoner are collectively referenced herein as the "Compensation Committee Defendants."

74. Defendants Jackson and Romano are collectively referenced herein as the "Securities Class Action Defendants."

75. The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

76. During the Relevant Period, the Individual Defendants were actively engaged in managing the Company's operations at the highest levels and had access to confidential and proprietary information related to the Company's business, operations, services, markets, competition, sales, demand, backlog, and future business prospects. They also participated in drafting, producing, reviewing, and disseminating the allegedly false and misleading statements detailed herein. Furthermore, they were either aware of or recklessly disregarded the inaccuracies and misrepresentations made about the Company through public statements, representations, and filings and either approved or ratified these statements actively, or through inaction, thereby violating the federal securities laws.

77. As officers and controlling persons of a publicly traded company whose securities are registered with the SEC under the Exchange Act and listed on the New York Stock Exchange, the Individual Defendants had a duty to promptly disclose truthful, accurate, and complete information regarding the Company's business, operations, services, markets, competition, sales, demand, backlog, and current and future business prospects. They were also obligated to correct any prior statements that were materially false or misleading to ensure that the market price of the Company's publicly traded shares reflected truthful, accurate and complete information. The Defendants' false and misleading representations and omissions during the Relevant Period constituted a violation of these specific duties and obligations under federal securities laws.

78. The Individual Defendants, by virtue of their positions of control and authority as officers and directors of the Company, exercised control over the content of the Company's SEC filings, press releases, and other public statements issued during the Relevant Period. Each Individual Defendant received copies of the documents alleged to be false and misleading before or shortly after their publication and had the ability and opportunity to prevent their issuance or ensure their correction. As a result, each Individual Defendant bears responsibility for the accuracy of the public statements described herein and is therefore primarily liable for the representations contained within them.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

79. By reason of their positions as officers, directors, and/or fiduciaries of ChargePoint, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed ChargePoint and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

80. The Individual Defendants were and are required to use their utmost ability to control and manage ChargePoint in a fair, just, honest, and equitable manner.

81. The Individual Defendants were and are required to act in furtherance of the best interests of ChargePoint and its shareholders to benefit all shareholders equitably.

82. Each director and officer of the Company owes ChargePoint and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

83. As fiduciaries of ChargePoint, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

84. The officers and directors of ChargePoint were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

85. Each Individual Defendant under their position as officers and directors of ChargePoint owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

86. As ChargePoint's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

87. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

88. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

89. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

(a) Ensure the Company's affairs were managed efficiently and in a business-like manner to achieve the highest quality performance;

(b) Ensure the Company operated diligently, honestly, and prudently, in full compliance with all applicable district and state laws, rules, regulations, and contractual obligations, and acted strictly within its legal authority;

(c) Ensure that communications with the public and shareholders were timely, complete, and made with candor; and

(d) Upon notice of issues concerning the Company's business practices or operations, act in good faith to take appropriate measures to correct the misconduct and prevent its recurrence.

90. Each of the Individual Defendants also bore a duty of loyalty to ChargePoint and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

91. During the pertinent times, the Individual Defendants served as agents for each other and for ChargePoint, always operating within the parameters of their agency.

92. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within ChargePoint, were privy to detrimental, confidential information concerning the Company.

**ChargePoint Holdings, Inc.'s**
**Code of Business Conduct & Ethics**

93. The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with ChargePoint's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states, in pertinent part, the following:

**1. Introduction**

> This Code of Conduct (the "Code") covers a wide range of business practices and procedures. It does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers and employees of ChargePoint Holdings, Inc. and its

subsidiaries (collectively, the "Company"). All directors, officers and employees of the Company should be familiar with the Code, conduct themselves accordingly, seek to avoid even the appearance of improper behavior and report any suspected violations as described in Section 25, "Reporting and Enforcement." The Code should also be provided to and followed by the Company agents and representatives, including consultants.

If you violate the standards in the Code, you may be subject to disciplinary action, up to and including immediate termination of employment.

If a law conflicts with a policy in the Code, you must comply with the law. If you have any questions about these conflicts, ask your manager or the Company's Chief Executive Officer, Chief Financial Officer or designated legal personnel how to handle the situation. The Code supersedes all other codes of conduct, policies, procedures, instructions, practices, rules or written or verbal representations to the extent that they are inconsistent with the Code. We are committed to continuously reviewing and updating our policies and procedures. The Code, therefore, is subject to modification.

Nothing in the Code modifies the Company's at-will employment relationship with its employees, which may only be modified in an express written agreement signed by the employee and the Company's Chief Executive Officer.

**2. Purpose**

The Code seeks to deter wrongdoing and to:

- Promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;
- Promote compliance with applicable governmental laws, rules and regulations;
- Protect Company assets, including corporate opportunities and confidential information;
- Promote fair dealing practices;
- Deter wrongdoing;
- Promote prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and
- Ensure accountability for adherence to the Code.

**3. Compliance with Applicable Laws, Rules and Regulations**

Obeying the law is the foundation on which the Company's ethical standards are built. You must comply with applicable laws, rules and regulations. Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from managers or other appropriate personnel.

**4. Honest and Ethical Conduct**

The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

**9. Public Disclosure of Information**

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

- Be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and
- Take all necessary steps intended to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

**10. Outside Communications**

The Company has established specific policies regarding who may communicate information to the public, the press and the financial analyst communities:

- The Company's Chief Executive Officer, Chief Financial Officer, Chief Marketing Officer and investor relations personnel are official spokespeople for financial matters.
- The Company's Chief Executive Officer, Chief Financial Officer, Chief Marketing Officer, and corporate communications personnel are official spokespeople for public comment, press, marketing, technical and other such information.
- All Company related communications made on behalf of the Company to public audiences, including formal communications and presentations made

to investors, customers or the press, require prior approval in accordance with the Company's established policies for such communications. Such approval includes review by investor relations or corporate communications personnel, as applicable, with final review by the Company's Chief Executive Officer or Chief Financial Officer, who will ensure that all necessary review is undertaken.

These designees for such communications are the only people who may communicate externally on behalf of the Company. Employees and directors should refer all inquiries or calls from the press, from shareholders or from financial analysts to the investor relations department or the Company's Chief Financial Officer, who will see that the inquiry is directed to the appropriate authority within the Company. Employees and directors may not publish or make public statements outside the scope of employment with or service to the Company that might be perceived or construed as attributable to the Company without preapproval from the Company's Chief Executive Officer, Chief Financial Officer or General Counsel, as appropriate. Any such statement must include the Company's standard disclaimer that the publication or statement represents the views of the specific author and not of the Company. Consult the Investor Relations and Communications Policy for additional information.

* * *

**17. Record-Keeping**

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions and to comply with the law. For example, employees who must report their hours worked must only report the true and actual number of hours worked (whether for purposes of individual pay or for purposes of reporting such information to customers). The Company also requires each director and employee to disclose any transaction or arrangement among such individual or any family member or affiliated entity of such individual, on the one hand, and any other director, employee or any family member or affiliated entity of such other individual, on the other hand, that in any way relates to or arises out of such individual's professional relationship with the Company.

Many employees regularly use business expense accounts, which must be documented and recorded accurately in accordance with the Company's policies. If you are not sure whether you may seek reimbursement for a certain expense, ask your manager or the Chief Financial Officer.

All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Business records and communications often become public, and you should avoid exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies that can be misunderstood. This policy applies equally to electronic communications, internal memos and formal reports. Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Company's Chief Financial Officer or designated legal personnel.

* * *

## CODE OF ETHICS FOR CEO AND SENIOR FINANCIAL OFFICERS

In addition to being bound by all other provisions of this Code of Conduct, the CEO and senior financial officers are subject to the following additional specific policies:

The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in any public filings or other public communications made by the Company which contain financial information. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the General Counsel any material information of which he or she may become aware that affects the disclosures made by the Company in any public filing or other public communications which contain financial information.

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information he or she may have concerning a material misstatement in any reported financial information of the Company, in particular any material over or understatement of the Company's assets, liabilities, revenues, expenses, and/or cash flows.

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information such officer may have concerning any violation of this Code of Conduct, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information such officer may have

concerning evidence of a material violation of the securities laws or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Code of Conduct or of these additional procedures by the CEO and the Company's senior financial officers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code of Conduct and to these additional procedures, and shall include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or reassignment of the individual involved, suspension with or without pay or benefits (as determined by the Board) and potential termination of the individual's employment. In determining what action is appropriate in a particular case, the Board or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation occurred once or repeatedly, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

* * *

**ChargePoint Holdings, Inc.'s**
**Corporate Governance Guidelines**

94. The Board of Directors of ChargePoint also established the following guidelines for the conduct and operation of the Board.

**Introduction**

The Board of Directors (the "Board") of ChargePoint Holdings, Inc. (the "Company") has adopted these corporate governance guidelines to provide a framework within which the Board may conduct its oversight of the business and affairs of the Company to serve as the ultimate decision-making body of the Company.

**A. Role of the Board and Management**

The Company's business is conducted by its employees, managers, and officers, under the direction of the chief executive officer ("CEO") and the oversight of the Board, to enhance the long-term value of the Company and seek the best interests of its stockholders. The Board is elected by the stockholders to oversee management in its duties. In fulfilling their responsibilities, both management and the Board are informed by their fiduciary duties under applicable law.

## B. Principal Responsibilities and Duties of the Board

In addition to its general oversight of management, the Board also performs a number of specific functions as set forth below. These duties are set forth as a guide with the understanding that the Board will carry them out in a manner that is appropriate given the Company's needs and circumstances. The Board may supplement them as appropriate and may establish policies and procedures from time to time that it deems necessary or advisable in fulfilling its responsibilities.

1. **Selecting the Chairman of the Board and CEO.** The Board will select the Chairman of the Board and the CEO in accordance with the Company's certificate of incorporation and bylaws and based upon the best interests of the Company at any point in time. The duties of these officers are set forth in the Company's bylaws. The Board does not have a policy that requires the separation of these two roles. The Board may separate or combine the roles of the Chairman of the Board and CEO when and if it deems it advisable and in the best interests of the Company and its stockholders to do so.

2. **Selecting the Lead Independent Director.** If the Chairman of the Board is not an independent director, as defined under the rules of the New York Stock Exchange as such may be amended from time to time (the "Rules"), the Board will appoint an independent director as the "Lead Independent Director" to facilitate communication between management, the independent directors, and the Chairman of the Board. The Lead Independent Director will actively participate in setting agendas for Board meetings, preside at executive sessions of the Board, and perform such other duties as specified by the Board.

3. **Selecting Other Officers.** The Board is involved in the selection of other officers of the Company, including "executive officers," in accordance with the Company's bylaws.

4. **Evaluating Management Performance and Compensation.** The Board, primarily through the Compensation Committee, (i) oversees an annual evaluation of the Company's CEO and executive officers in light of established corporate performance goals and objectives and (ii) approves the compensation paid to the CEO and executive officers of the Company.

5. **Overseeing Management Succession Planning.** The Nominating and Corporate Governance Committee, in consultation with the full Board, is primarily responsible for succession planning for the CEO and oversees management's succession plans for other key executives. Succession planning can be critical in the event the CEO should cease to serve for any reason, including resignation or unexpected disability, or if their service is temporarily disrupted. In addition, the Board believes that establishment of a strong management team is the best way to prepare for an unanticipated executive officer departure and will confer with the CEO to encourage management development programs.

6. **Formulating Company Strategy.** The Board is actively involved with management in formulating corporate strategy and annually reviews the Company's strategic plan as well as its annual operating plans, budgets and major corporate actions.

7. **Overseeing Risk Management, Legal and Ethical Compliance.** The Board, as a whole, and through its standing committees, has responsibility for the oversight of the Company's risk management, legal and ethical compliance by considering that processes are in place for maintaining the integrity of the Company.

8. **Managing Potential Conflicts of Interest and Maintaining Loyalty and Ethical Behavior.** All members of the Board are expected to abide by the Company's policies, including its code of conduct, and to inform (i) the Nominating and Corporate Governance Committee of an actual or potential conflict of interest or (ii) the Audit Committee of a "related person transaction." If a director has a personal interest in a matter before the Board, the director must disclose the interest to the Board and recuse himself or herself from Board or committee information, discussion, or voting related to a particular matter if requested to do so by the Board on account of an actual, apparent or potential conflict of interest involving such director. Each member of the Board owes fiduciary duties to the Company including the duty of loyalty and the duty to act in the best interest of the Company. Many conflicts can be managed appropriately through recusal from related information, discussions and voting. If however, a significant conflict of interest involving a director cannot be resolved to the satisfaction of the Board after discussion with appropriate legal counsel, then the director having such conflict shall promptly tender (or offer to tender) his or her resignation from the Board. The Corporate Governance and Nominating Committee shall then review the appropriateness of that director's continued service on the Board in light of the conflict and make a recommendation to the Board as to whether the resignation should be accepted.

9. **Ensuring the Integrity of Financial Reporting.** The Audit Committee oversees the integrity of the Company's accounting and financial reporting systems, including overseeing the audit of the Company's annual financial statements by independent auditors, and assessing the Company's disclosure controls and procedures and systems of internal control.

* * *

**ChargePoint Holdings, Inc.'s**
**Audit Committee Charter**

95. In addition to the duties enumerated above, under the Audit Committee Charter in effect during relevant times, Defendants Harris (Chair), Heystee, and Singh-Bushell ("Audit

Committee Defendants") owed specific additional duties to ChargePoint. Specifically, the Audit Committee Charter States:

> Purpose
>
> The purpose of the Audit Committee (the "**Committee**") of the Board of Directors (the "**Board**") of ChargePoint Holdings, Inc. (the "**Company**") is to assist the Board with its oversight of:
>
> - the integrity of the Company's accounting and financial reporting processes and the audit of the Company's financial statements,
> - the Company's compliance with legal and regulatory requirements,
> - the qualifications, independence, and performance of the Company's independent registered public accounting firm (the "independent auditor"), and
> - the performance of the Company's internal audit function and independent auditor and the assessment and management of risks associated with the Company's internal accounting and financial controls.
>
> This Charter sets forth the composition, authority, and responsibilities of the Committee.
>
> The Committee's responsibility is one of oversight. The members of the Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the independent auditors.
>
> **Responsibilities and Duties**
>
> In addition to the responsibilities and duties expressly delegated to the Committee in this Charter, the Committee may exercise any other powers and carry out any other responsibilities consistent with this Charter, the purposes of the Committee, the Company's bylaws, governing law, applicable Rules, federal securities laws and such other requirements applicable to the Company.
>
> Review Responsibilities
>
> - Internal Controls. Review and discuss with management and the independent auditor the design, implementation and maintenance of the Company's internal controls, including the adequacy and effectiveness, significant deficiencies or material weaknesses in those controls reported by the independent auditor or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees

who have a significant role in the Company's internal controls. Review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.

- Disclosure Controls and Procedures. Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures. Review the attestations or reports by the independent auditors relating to disclosure controls and procedures.

- Review and Oversight of External Audit. Review and provide oversight of the external audit and monitor and discuss with management: (i) the independent auditor's annual audit plan and scope of audit activities and monitor such plan's progress; (ii) the scope and timing of the annual audit of the Company's financial statements; (iii) the results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the audited financial statements; (iv) major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles; (v) analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; (vi) any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, any significant disagreements between management and the independent auditor and management's responses thereto; (vii) hiring policies for the Company of employees or former employees of the independent auditors; and (viii) the reports submitted to the Committee by the independent auditors in accordance with generally accepted auditing standards and other legal or regulatory requirements.

- Review of External Audit Report. Obtain and review annually, prior to the completion of the independent auditor's annual audit of the Company's year-end financial statements, a report from the independent auditor describing (i) all critical accounting policies and practices to be reflected in the audit, (ii) (a) all alternative treatments of financial information within GAAP for policies and procedures related to material items that have been discussed with management, (b) ramifications of the use of such alternative disclosures and treatments and (c) the treatment preferred by the independent auditor and (iii) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences. Review any reports on such

topics or similar topics prepared by management and discuss with the independent auditor any material issues raised in such reports.

- Review Required Reports. Review and discuss with management and the independent auditor the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Forms 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K. Direct the independent auditors to review the annual and quarterly reports using professional standards and procedures for conducting such reviews. Conduct a postaudit review of the financial statements and audit findings, including any suggestions for improvements provided to management by internal audit or the independent auditors, and management's response to such suggestions.

- Review Financial Activities. Review the effect of regulatory and accounting initiatives, as well as offbalance sheet structures, on the Company's financial statements. Review and oversee the Company's cash management, investing activities, and tax planning and compliance, and approve policies related to these matters, if any.

- Oversee Risk Management. Provide oversight on the management of risks associated with the Company's financial reporting, accounting, and auditing matters, including the Company's guidelines and policies with respect to risk assessment and risk management, including but not limited to, review, assess and monitor compliance with the Company's investment policy and debt agreements. Such oversight shall include reviewing, at least annually with management, the Company's cybersecurity and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and to respond to data breaches and steps management has taken to monitor and control cybersecurity risk exposures. The Committee shall periodically review with management the Company's artificial intelligence policies and programs, trends in data management and artificial intelligence, and any potential exposures relating to these matters. The Committee shall perform such other tasks related to the oversight of the Company's risks from cybersecurity threats as the Board may delegate to the Committee.

- Quarterly Earnings Review. Review, in general, earnings press releases, and review and discuss with management and the independent auditors' policies with respect to earnings press releases and the type and presentation of information to be included therein (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts, and rating agencies.

- Performance Review. Review and evaluate the performance of the Committee on an annual basis.

- Review of Internal Audit. Oversee internal audit department's structure, objectivity, responsibilities, staffing, resources and budget. Discuss with the independent auditor the independent auditor's judgment about the competence, performance and cooperation of internal audit and management and internal audit's responsibilities, budget and staffing.

- Charter Review. Review and reassess the adequacy of this Charter periodically and submit any recommended changes to the Charter to the Board for approval.

* * *

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

96. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

97. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

98. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

99. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, the Individual Defendants, as directors of

ChargePoint, were direct, essential, and significant participants, collectively and individually, in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

100. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of hir or her overall role in furthering the misconduct.

101. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of ChargePoint, and at all times operated within the course and scope of that agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

102. ChargePoint is a provider of networked solutions for electric vehicle charging, including charging hardware and its cloud-based subscription platform. During the Relevant Period, the Company represented that its products and services were designed to accommodate a diverse range of charging scenarios, including residential, workplace, parking, hospitality, retail, and transportation fleet applications.

### The Revenue Inflation Scheme

103. Throughout the Relevant Period, ChargePoint publicly represented that it recognized revenue in accordance with generally accepted accounting principles (GAAP) and with the Company's own stated revenue recognition policy under ASC 606, and it attributed its reported quarter-after-quarter revenue growth to organic customer demand for its products. In reality, a material portion of the revenue the Company reported in each quarter of the Relevant

Period was generated through five categories of undisclosed practices that violated both GAAP and the Company's stated policy, and that were unsustainable, as alleged in the Securities Action.

104. ChargePoint shipped charging products to customers who had not approved delivery, and recognized revenue on those shipments, in violation of ASC 606 Steps 1, 3, and 5. Sales and operations personnel were directed at quarter end to ship all pending orders regardless of customer readiness, including so-called Hold for Release orders, which the Company then booked and billed as revenue.

105. ChargePoint shipped products that customers could not use in order to recognize revenue in the current quarter, in violation of ASC 606 Step 5. This included shipping empty charger frames without internal components.

106. ChargePoint offloaded product on distributors and resellers before end customers needed it, using coercion and undocumented side deals, rebates, and discounts that distorted reported revenue, in violation of ASC 606 Steps 1, 3, and 5. The consequences persisted long after the Relevant Period: as of early 2025, one reseller was still holding nearly $100 million of ChargePoint inventory it could not sell, and another was still holding approximately $40 million.

107. ChargePoint activated software subscriptions for customers that did not exist, and for charging stations that had not been installed or activated, in order to inflate reported subscription revenue, in violation of ASC 606 Steps 1, 3, and 5.

108. Defendant Jackson personally acknowledged and approved terms of undocumented side deals, including rebates, in recurring quarterly calls with a reseller executive, and was required to sign off on discounts beyond the Company's stated promotions.

109. The supply chain disruptions the Company did disclose were the catalyst for this conduct rather than a separate matter. Genuine constraints on specific product lines and

components, aggravated by the Company's outsourcing of its accounts payable function, drove Defendants to force revenue from the products that were available. The same constraints led ChargePoint to over-procure its first-generation CPE 250 DC fast charger in a failed attempt to get ahead of them, producing an inventory glut that the Company failed to write down on a timely basis and that ultimately required approximately $70 million in impairment charges.

110. These practices are supported by the firsthand accounts of eleven former ChargePoint employees and a confidential witness, whose knowledge collectively spans every quarter of the Relevant Period, as set forth in the Third Amended Complaint in the Securities Action.

111. On May 21, 2026, the court denying the motion to dismiss that complaint expressly rejected Defendants' request that it credit their competing account of legitimate revenue practices over those witness accounts at the pleading stage.

**Materially False and Misleading Statements**

112. The Relevant Period begins on December 7, 2021, when ChargePoint issued a press release (the "December 2021 Press Release") providing a "Third Quarter Fiscal 2022 Financial Overview." In the press release, Defendant Romano made the following statement: "ChargePoint has delivered another strong quarter, as we have continued to scale our commercial, fleet and residential verticals across two continents[.]" Romano further represented that ***"[t]he investments we have made over many years have enabled us to capture charging demand from customers preparing for an electric future. This quarter we added more customers at an accelerated rate, while also successfully closing two acquisitions.***"

113. The December 2021 Press Release further highlighted the Company's quarterly revenue performance, stating:

> "revenue was $65.0 million, an increase of 79% from $36.4 million in the prior year's same quarter. Networked charging revenue for the third quarter was $47.5 million, an increase of 111% from $22.6 million and subscription revenue was $13.4 million, up 24% from $10.8 million."

114. The December 2021 Press Release also highlighted the Company's gross margin performance, stating: "***GAAP gross margin was 25%, up from 20% in the prior year's same quarter primarily as a result of product cost improvements and the impact of acquisitions***."

115. The December 2021 Press Release also addressed the Company's quarterly net loss, reporting: "GAAP net loss was $69.4 million, which included a $2.4 million loss from the change in fair value of warrant liabilities and $16.0 million in stock-based compensation expense."

116. As for fourth quarter 2022 and full year 2022 guidance, the December 2021 Press Release stated that: "***ChargePoint expects revenue of $73 - $78 million for its fourth quarter ending January 31, 2022, and is raising its full year revenue outlook to $235 - $240 million, from $225 - $235 million, for the fiscal year ending January 31, 2022.***"

117. On March 2, 2022, ChargePoint issued a press release (the "March 2022 Press Release") announcing its fourth quarter and fiscal year 2022 financial results. In the March 2022 Press Release, Defendant Romano stated: "***ChargePoint delivered another outstanding quarter, exceeding the high end of both our quarterly and annual revenue guidance and advancing our technology leadership in our commercial, fleet and residential verticals across North America and Europe[.]***" Defendant Romano further represented that "[w]e had numerous successes in our first year as a publicly traded company, including a 65 percent year over year increase in annual revenue, two strategic acquisitions, expansion of our activated port count by over 60 percent, and growing our team of world class talent."

118. The March 2022 Press Release further highlighted the Company's quarterly revenue growth, reporting revenue of:

> $80.7 million, an increase of 90% from $42.4 million in the prior year's same quarter. Networked charging systems revenue for the fourth quarter was $59.2 million, an increase of 109% from $28.3 million in the prior year's same quarter and subscription revenue was $17.2 million, up 57% from $11.0 million.

119. In regard to quarterly gross margin, the March 2022 Press Release stated that: "***GAAP gross margin was 22%, up from 21% in the prior year's same quarter primarily due to the impact of acquisitions***."

120. The March 2022 Press Release also addressed the Company's quarterly net loss, reporting: "GAAP net loss was $60.5 million, which included a $16.9 million gain from the change in fair value of warrant liabilities and $15.4 million in stock-based compensation expense."

121. The March 2022 Press Release also provided guidance for the fiscal year ending January 31, 2023, stating that ChargePoint expected:

- ***Revenue of $450 million to $500 million. At the midpoint, this represents an anticipated increase of 96% as compared to the prior year***
- ***Non-GAAP gross margin of 22% to 26%***
- ***Non-GAAP operating expenses of $350 million to $370 million. At the midpoint, this represents an anticipated increase of 50% as compared to the prior year.***

122. On May 31, 2022, ChargePoint issued a press release (the "May 2022 Press Release") providing a "First Quarter Fiscal 2023 Financial Overview." In the May 2022 Press Release, Defendant Romano stated: "***[p]ositive first quarter results, despite expected significant headwinds due to global supply constraints, are a testament to the strength of our business[.]***" Romano further represented that "***[o]ur investments in a comprehensive portfolio for all verticals we serve continue to set us apart when customers seek a charging solution***."

123. The May 2022 Press Release stated the following regarding quarterly revenue:

> $81.6 million, an increase of 102% from $40.5 million in the prior year's same quarter. Networked charging systems revenue for the first quarter was $59.6 million, an increase of 122% from $26.8 million in the prior year's same quarter and subscription revenue was $17.6 million, up 63% from $10.8 million.

124. In regard to quarterly gross margin, the May 2022 Press Release stated that:

> GAAP gross margin was 15%, ***down from 23% in the prior year's same quarter as newer, currently lower margin, products performed strongly relative to more mature, higher margin offerings, and due to supply chain disruptions, which affected both cost and supply availability.***

125. The May 2022 Press Release also addressed the Company's quarterly net loss, reporting that:

> First quarter GAAP net loss was $79.4 million, down from $89.3 million in the prior year's same quarter. Non-GAAP pre-tax net loss in the first quarter, which primarily excludes $24.0 million in stock-based compensation expense, $3.0 million amortization expense from acquired intangible assets and other items, was $52.8 million as compared to $71.7 million in the prior year's same quarter. Non-GAAP Adjusted EBITDA Loss, which primarily excludes stock-based compensation expense, depreciation expense and amortization expense of acquired intangible assets, was $48.9 million in the first quarter, as compared to $67.1 million in the prior year's same quarter.

126. The May 2022 Press Release also provided guidance for the second quarter of fiscal year 2023, stating that the Company: "***expects revenue of $96 million to $106 million. At the midpoint, this represents an anticipated increase of 80% as compared to the prior year's same quarter***."

127. The press release further stated that, for the full fiscal year ending January 31, 2023, ChargePoint continued to expect the same revenue, non-GAAP gross margin, and non-GAAP operating expense guidance previously reported in the March 2022 Press Release.

128. On August 30, 2022, ChargePoint issued a press release (the "August 2022 Press Release") providing a "Second Quarter Fiscal 2023 Financial Overview." In the August 2022 Press Release, Defendant Romano stated: "***ChargePoint delivered another strong quarter, with***

***continued growth across all verticals and geographies[.]*** ” Romano further represented that “[w]e continue to execute on our strategy, as demand continues to grow for our portfolio of industry-leading charging solutions for every vertical and in both North America and Europe.”

129. The August 2022 Press Release further highlighted ChargePoint’s quarterly revenue growth, reporting revenue of:

> $108.3 million, up 93% from $56.1 million in the prior year’s same quarter. Networked charging systems revenue for the second quarter was $84.1 million, up 106% from $40.9 million in the prior year’s same quarter and subscription revenue was $20.2 million, up 68% from $12.1 million.

130. The August 2022 Press Release also addressed ChargePoint’s quarterly gross margin, reporting:

> “GAAP gross margin was 17%, ***down from 19% in the prior year's same quarter primarily due to supply chain disruptions, which affected both cost and supply availability as well as increasing new product introduction and transition costs.***”

131. The August 2022 Press Release also addressed the Company’s quarterly net loss, reporting: GAAP net loss was $92.7 million, as compared to $84.9 million in the prior year’s same quarter. It also provided guidance for the third quarter of fiscal year 2023, stating that the Company: “***expects revenue of $125 million to $135 million. At the midpoint, this represents an anticipated increase of 100% as compared to the prior year’s same quarter***.”

132. The press release further stated that, for the full fiscal year ending January 31, 2023, ChargePoint continued to expect the same revenue, non-GAAP gross margin, and non-GAAP operating expense guidance previously disclosed in the March 2022 and May 2022 Press Releases.

133. On December 1, 2022, ChargePoint issued a press release (the “December 2022 Press Release”) providing a “Third Quarter Fiscal 2023 Financial Overview.” In the December 2022 Press Release, Defendant Romano stated: “***ChargePoint delivered another quarter of***

***growth exceeding 90% year-over-year, as we continue to scale the business to meet strong demand for our solutions across North America and Europe[.]***" Romano further represented that "[o]ur networked, asset-light business model continues to enable our growth as we strive to deliver improved margins and operating leverage."

134. The December 2022 Press Release further highlighted ChargePoint's quarterly revenue growth, reporting revenue of:

> "$125.3 million, up 93% from $65.0 million in the prior year's same quarter. Networked charging systems revenue for the third quarter was $97.6 million, up 105% from $47.5 million in the prior year's same quarter and subscription revenue was $21.7 million, up 62% from $13.4 million."

135. The December 2022 Press Release also addressed ChargePoint's quarterly gross margin, stating:

> GAAP gross margin was 18%, ***down from 25% in the prior year's same quarter primarily due to supply chain disruptions, which affected both cost and supply availability, and increased new product introduction and transition costs.***

136. The December 2022 Press Release also addressed the Company's quarterly net loss, reporting: "GAAP net loss was $84.5 million, as compared to $69.4 million in the prior year's same quarter."

137. The December 2022 Press Release also provided guidance for the fourth quarter and full fiscal year 2023, stating:

> ***For the fourth fiscal quarter ending January 31, 2023, ChargePoint expects:***
>
> - ***Revenue of $160 million to $170 million. At the midpoint, this represents an anticipated increase of 108% as compared to the prior year's same quarter***
> - ***A sequential Non-GAAP gross margin improvement from the third quarter's 20%, resulting in annual gross margin below previous guidance***
>
> ***For the full fiscal year ending January 31, 2023, ChargePoint expects:***

- ***Revenue of $475 million to $485 million. At the midpoint, this represents an anticipated increase of $5 million as compared to previous guidance***
- ***Non-GAAP operating expenses of $325 million to $335 million. At the midpoint, this represents an anticipated decrease of $30 million as compared to previous guidance.***

138. On March 2, 2023, ChargePoint issued a press release (the "March 2023 Press Release") providing a "Fourth Quarter Fiscal 2023 Financial Overview." In the March 2023 Press Release, Defendant Romano stated that the Company: "***delivered its largest sequential revenue growth to date and another record quarter, although below our guidance range as supply challenges for our DC solutions and quarter end shipment challenges at this growth rate persisted***." Romano further represented that ChargePoint "***continued to extend our technology and market leadership position across North America and Europe this year while driving 94% year-over-year growth and delivering improving gross margin and better operating expense leverage as we progress toward profitability***."

139. The March 2023 Press Release further highlighted ChargePoint's quarterly revenue growth, reporting revenue of:

> $152.8 million, up 93% from $79.3 million in the prior year's same quarter. Networked charging systems revenue for the fourth quarter was $122.3 million, up 109% from $58.7 million in the prior year's same quarter and subscription revenue was $25.7 million, up 50% from $17.2 million.

140. The March 2023 Press Release also addressed ChargePoint's quarterly gross margin, stating: "***GAAP gross margin improved sequentially to 22%, but was flat to the prior year's same quarter***."

141. The March 2023 Press Release also addressed the Company's quarterly net loss, reporting:

> GAAP net loss was $78.0 million, as compared to $60.1 million in the prior year's same quarter primarily due to a $16.9 million fair value gain of the assumed

> common stock warrant liability in the prior year quarter and higher stock-based compensation expense in the current quarter.

142. The March 2023 Press Release also provided a "Full Fiscal 2023 Financial Overview," reporting annual revenue of:

> $468.1 million, an increase of 94% from $241.0 million in the prior year. Networked charging systems revenue for the full year was $363.6 million, an increase of 109% from $173.9 million, and subscription revenue was $85.3 million, up 59% from $53.5 million.

It also addressed ChargePoint's annual gross margin, stating: "***GAAP gross margin was 18%, down from 22% in the prior year.***"

143. The March 2023 Press Release also addressed ChargePoint's annual net loss, stating: "GAAP net loss was $344.5 million as compared to $132.2 million in the prior year."

144. The March 2023 Press Release also provided guidance for the first quarter of fiscal year 2024, stating that the Company: "***expects revenue of $122 million to $132 million. At the midpoint, this represents an anticipated increase of 56% as compared to the prior year's same quarter.***"

145. On June 1, 2023, ChargePoint issued a press release (the "June 2023 Press Release") providing a "First Quarter Fiscal 2024 Financial Overview." In the June 2023 Press Release, Defendant Romano stated:

> ChargePoint delivered strong results in the first quarter, growing at nearly 60% year-over-year. We focused on delivering our broad portfolio of charging solutions across North America and Europe, while continuing to improve gross margins, and managing operating expenses[.]

Romano further represented that:

> [t]he positive first quarter results are a testament to the strength and diversity of our business. As the only charging network to operate across all verticals in North America and Europe, we believe we remain well positioned to take advantage of the inevitable long-term growth opportunity ahead.

146. The June 2023 Press Release further highlighted ChargePoint's quarterly revenue growth, reporting revenue of:

> $130.0 million, up 59% from $81.6 million in the prior year's same quarter. Networked charging systems revenue for the first quarter was $98.3 million, up 65% from $59.6 million in the prior year's same quarter. Subscription revenue was $26.4 million, up 49% from $17.6 million.

147. The June 2023 Press Release also addressed ChargePoint's quarterly gross margin, stating: "***GAAP gross margin was 23%, up from 15% in the prior year's same quarter.***" It also addressed ChargePoint's quarterly net loss, stating: "GAAP net loss was $79.4 million, down from $89.3 million in the prior year's same quarter."

148. The June 2023 Press Release also provided guidance for the second quarter of fiscal year 2024, stating that the Company: "***expects revenue of $148 million to $158 million. At the midpoint, this represents an anticipated increase of 41% over the prior year's same quarter***."

149. On June 8, 2023, ChargePoint filed a Quarterly Report on Form 10-Q with the SEC (the "1Q 2024 Quarterly Report"). The 1Q 2024 Quarterly Report was signed by Defendant Jackson and included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Romano and Jackson. The 1Q 2024 Quarterly Report stated the following, in relevant part:

> Gross profit increased during the three months ended April 30, 2023 compared to the three months ended April 30, 2022 primarily due to an increase in Networked Charging Systems sales that resulted from an increase in the number of Networked Charging Systems delivered and an increase in Subscriptions revenue.
>
> Gross margin increased during the three months ended April 30, 2023 compared to the three months ended April 30, 2022 primarily due to efficiencies realized in managing cost of Networked Charging Systems.

* * *

> Disruptions in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers have resulted in additional costs and, to a lesser extent, component shortages, and have led to fluctuations in EV sales in markets around the world. Increased demand for personal electronics and trade restrictions that affect raw materials have contributed to a shortfall of semiconductor chips, which has caused additional supply challenges both within and outside of ChargePoint's industry. Ongoing supply chain challenges, component shortages and heightened logistics costs have adversely affected ChargePoint's gross margins in recent quarters and ChargePoint expects that gross margins may continue to be adversely affected by increased material costs and freight and logistic expenses in the future.

150. The foregoing statements were materially false and misleading when made because they failed to disclose material adverse facts concerning ChargePoint's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to conceal that: (1) a material portion of ChargePoint's reported revenue was derived from undisclosed practices that violated GAAP and the Company's own revenue recognition policy, including unauthorized shipments, shipments of incomplete or incorrect products, channel stuffing through resellers by means of undocumented side deals and rebates, and premature software token activations; (2) as a result, the Company's reported revenue growth was not attributable to organic demand and was unsustainable; (3) ChargePoint was incurring increased component costs and supply overruns associated with its first-generation direct current ("DC") charging products; (4) those conditions made it likely that the Company would incur impairment charges; (5) those charges and related costs would adversely affect ChargePoint's profitability; and (6) the Company maintained deficient internal controls. Accordingly, the Company's and the Individual Defendants' statements concerning ChargePoint's business, operations, and prospects were materially false and misleading when made and lacked a reasonable basis.

**<u>The Truth Begins to Emerge</u>**

151. On September 6, 2023, ChargePoint issued a press release (the "September 2023 Press Release") providing a "Second Quarter Fiscal 2024 Financial Overview." In the September

2023 Press Release, Defendant Romano stated: "[i]n the second quarter, ChargePoint delivered solid growth. Our revenue of $150 million represents a 39% year-over-year increase despite a hesitant economy[.]" Romano further stated that:

> "[i]n the quarter we fortified our access to working capital with a $150 million revolving credit facility and $38 million raised via our 'at-the-market' offering. ***We took an inventory impairment charge to address a significant supply-chain related issue, and we announced an estimated $30 million in annualized operating expense savings from reorganizing the business for agility, efficiency and scale.*** We remain committed to delivering on our goal of generating positive non-GAAP adjusted EBITDA by the end of calendar 2024.

152. With respect to gross margin, the September 2023 Press Release disclosed the following:

> ***Second quarter GAAP gross margin was 1%, down from 17% in the prior year's same quarter, and non-GAAP gross margin was 3%, down from 19% in the prior year's same quarter, in both cases primarily due to a $28.0 million, or 19 percentage point, inventory impairment charge. This inventory impairment charge was taken to address legacy supply chain-related costs and supply overruns on a particular DC product***.

153. The September 2023 Press Release also addressed the impact of the inventory impairment charge on the Company's net loss, stating that:

> GAAP net loss was $125.3 million, up from $92.7 million in the prior year's same quarter. Non-GAAP pre-tax net loss was $86.1 million as compared to $62.3 million in the prior year's same quarter, ***both reflecting the $28.0 million inventory impairment charge***. ***Non-GAAP Adjusted EBITDA Loss was $81.2 million also reflects this inventory impairment charge in the second quarter, as compared to $56.2 million in the prior year's same quarter.***

154. The September 2023 Press Release also provided "Third Quarter, Fourth Quarter and Full Fiscal Year 2024 Guidance," stating:

> For the third fiscal quarter ending October 31, 2023, ChargePoint expects:
>
> - Revenue of $150 million to $165 million. At the midpoint, this represents an anticipated increase of 26% as compared to the prior year.
> - Non-GAAP gross margin of 22 to 25%.

- Non-GAAP operating expenses of $81 million to $84 million.

> For the fourth fiscal quarter ending January 31, 2024, ChargePoint expects non-GAAP operating expenses of $79 million to $82 million.
>
> For the full fiscal year ending January 31, 2024, ChargePoint expects revenue of $605 million to $630 million. At the midpoint, this represents an anticipated increase of 32% as compared to the prior year.

155. During a related earnings call held on September 6, 2023, Defendant Jackson addressed the Company's guidance for the third quarter of fiscal year 2024, stating:

> "Turning to guidance. ***For the third quarter of fiscal 2023, we expect revenue to be $150 million to $165 million, up 26% year-on-year and up 5% sequentially at the midpoint.*** For the full fiscal year, we are guiding to $605 million to $630 million, up 32% year-on-year at the midpoint.
>
> Regarding gross margin, ***for the third quarter, we expect to be between 22% and 25% on a non-GAAP basis as we work through the inventory levels discussed earlier. With the inventory issue behind us and aggressive programs for improving our cost structure on supply and manufacturing, we would expect to resume continued improvement in gross margin next year.***
>
> Though we don't typically guide on operating expenses, given the reorganization we announced today, we want to help reset everyone on a new level for the remainder of this year."

156. On this news, ChargePoint's stock price declined approximately 11% in a single trading day, closing at $6.29 per share on September 7, 2023.

157. On September 11, 2023, ChargePoint filed a Quarterly Report on Form 10-Q with the SEC (the "2Q 2024 Quarterly Report"). The 2Q 2024 Quarterly Report was signed by Defendant Jackson and included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Romano and Jackson. In the filing, the Company stated:

> ***For the remainder of fiscal year 2024, ChargePoint expects revenue to grow in both Networked Charging Systems and subscriptions due to increased demand in EVs and the related charging infrastructure market.***

158. With respect to the inventory impairment charge, the 2Q 2024 Quarterly Report stated the following:

> Inventory levels are analyzed periodically and written down to their net realizable value if they have become obsolete, have a cost basis in excess of expected net realizable value or are in excess of expected demand. ***During the three months ended July 31, 2023, the Company recorded an impairment charge of $28.0 million, consisting of $15.0 million charge to write down the carrying value of certain inventory on hand, as well as $13.0 million charge for losses on noncancelable purchase commitments for inventory to be received after July 31, 2023, to reduce the carrying value of certain DC fast charging products to their estimated net realizable value.*** The inventory impairment charge is included in the cost of revenue - networked charging systems in the condensed consolidated statements of operations.

159. The 2Q 2024 Quarterly Report also included the following risk disclosure concerning the Company's inventory levels:

> ChargePoint's revenue growth is directly tied to the number of passenger and commercial EVs sold, which it believes drives the demand for EV charging infrastructure. The market for EVs is still rapidly evolving and although demand for EVs has grown in recent years, there is no guarantee of such future demand.
>
> * * *
>
> ***ChargePoint depends on the timely supply of materials, services and related products to meet the demands of its customers, which depends in part on the timely delivery of materials and services from suppliers and contract manufacturers. Significant or sudden increases in demand for EV charging stations, as well as worldwide demand for the raw materials and services that ChargePoint requires to manufacture and sell EV charging stations, including component parts, may result in a shortage of such materials or may cause shipment delays due to delays could adversely impact ChargePoint's suppliers' ability to meet ChargePoint's demand requirements.***

160. The foregoing statements were materially false and misleading when made because they failed to disclose material adverse facts concerning ChargePoint's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to conceal that: (1) a material portion of ChargePoint's reported revenue was derived from undisclosed practices that violated GAAP and the Company's own revenue recognition policy, including unauthorized shipments, shipments of incomplete or incorrect products, channel stuffing through resellers by means of undocumented side deals and rebates, and premature

software token activations; (2) as a result, the Company's reported revenue growth was not attributable to organic demand and was unsustainable; (3) ChargePoint was incurring increased component costs and supply overruns associated with its first-generation direct current ("DC") charging products; (4) those conditions made it likely that the Company would incur impairment charges; (5) those charges and related costs would adversely affect ChargePoint's profitability; and (6) the Company maintained deficient internal controls. Accordingly, the Company's and the Individual Defendants' statements concerning ChargePoint's business, operations, and prospects were materially false and misleading when made and lacked a reasonable basis.

161. As a result of the foregoing, the Company and the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading, and lacked a reasonable basis.

**<u>The Truth Fully Emerges</u>**

162. On November 16, 2023, ChargePoint filed a Form 8-K with the SEC attaching two press releases. The Form 8-K and one of the press releases disclosed the departures of Defendants Romano and Jackson from the Company. The Form 8-K stated, in relevant part:

> On November 16, 2023, ChargePoint issued a press release announcing the appointment of Mr. Rick Wilmer to the position of President and Chief Executive Officer and Ms. Mansi Khetani to the position of interim Chief Financial Officer, effective immediately. The Company's former President and Chief Executive Officer, Pasquale Romano, resigned from the Company and as a member of the Board of Directors of the Company (the "Board") at the request of the Board and the Company's former Chief Financial Officer, Rex S. Jackson, separated from the Company, respectively, effective November 16, 2023.

163. Also on November 16, 2023, ChargePoint issued a press release (the "November 2023 Press Release") announcing its third quarter fiscal 2024 financial results. In the November 2023 Press Release, Defendant Wilmer stated:

> Our core markets of North America and Europe both came under pressure late in the third quarter, with revenue falling far short of expectations. Overall

> macroeconomic conditions, along with fleet and commercial vehicle delivery delays impacted anticipated deployments with government, auto dealership and workplace customers.

164. Defendant Wilmer further stated:

> The ChargePoint board and I are committed to significantly improving operational execution to ensure that the Company is building a stronger, more resilient business for the benefit of all stakeholders. Our first steps are to take an additional non-cash inventory impairment charge related to product transitions and to better align inventory with current demand. We remain committed to our goal of generating positive adjusted EBITDA in the fourth quarter of calendar 2024.

165. Regarding its "Preliminary Third Quarter Fiscal Year 2024 Financial Performance," the November 2023 Press Release stated, in relevant part:

- Revenue of ***$108 to $113 million, as compared to $150 to $165 million as previously expected.***
- ChargePoint expects to take ***a non-cash impairment charge of $42 million resulting in GAAP gross margin of negative 23% to negative 21% and non- GAAP gross margin of negative 19% to negative 17%.***
- Pre-impairment non-GAAP gross margin of 19% to 21%, as compared to 22% to 25% as previously expected.
- ChargePoint expects GAAP operating expenses of $129 million to $131 million. Non-GAAP operating expenses of $80 million to $82 million, as compared to $81 million to $84 million as previously expected.

166. On this news, ChargePoint's stock price declined approximately 35% in a single trading day, closing at $2.02 per share on November 17, 2023.

**The Securities Action**

167. The misconduct alleged herein is also the subject of the Securities Action filed against ChargePoint and certain of its senior executives, namely Defendants Romano and Jackson and former Chief Commercial and Revenue Officer Michael Hughes. The Third Amended Complaint in the Securities Action alleges that a material portion of ChargePoint's reported Relevant Period revenue was derived from undisclosed practices that violated GAAP

and the Company's own revenue recognition policy — including unauthorized shipments, shipments of incomplete or incorrect products, channel stuffing through resellers by means of undocumented side deals and rebates, and premature software token activations — and that the supply constraints and inventory over-procurement described above were the catalyst for, and were concealed by, those practices.

168. On May 21, 2026, Judge Wise denied the Securities Action defendants' motion to dismiss, finding that the Third Amended Complaint substantially clarified and strengthened the allegations, adequately linked Defendants' statements and conduct to the alleged fraud, and addressed the deficiencies identified in the prior dismissal order. Order at 2–3.The court further rejected Defendants' attempt to have the court weigh competing evidence and resolve factual disputes at the pleading stage, allowing the securities fraud claims to proceed. *Id*.

**INSIDER SELLING**

169. Rather than disclose material information to the market, Defendants Romano, Jackson, Wilmer, Chizen, Linse, and Singh-Bushell (the "Insider Selling Defendants") used their access to 's material nonpublic information to sell their personal holdings while the Company's stock remained artificially inflated. As directors and officers, the Insider Selling Defendants were entrusted with, and had access to, material, nonpublic information concerning ChargePoint's true business prospects.

***Defendant Romano***

170. While in possession of material nonpublic information, Defendant Romano sold a total of 1,275,802 shares of his personally held ChargePoint stock for proceeds of over $15.2 million before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

| Date | Number of Shares Sold | Avg Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| **8/18/2023** | 10,000 | 7.15 | 71,489 |
| **8/15/2023** | 30,000 | 7.42 | 222,530 |
| **8/10/2023** | 30,000 | 7.82 | 234,466 |
| **8/7/2023** | 30,000 | 7.92 | 237,474 |
| **7/27/2023** | 15,000 | 8.28 | 124,143 |
| **7/24/2023** | 15,000 | 8.28 | 124,265 |
| **7/20/2023** | 10,000 | 8.31 | 83,090 |
| **7/17/2023** | 15,000 | 8.68 | 130,201 |
| **7/12/2023** | 15,000 | 8.84 | 132,598 |
| **7/7/2023** | 15,000 | 8.84 | 132,602 |
| **7/3/2023** | 15,000 | 8.71 | 130,640 |
| **6/23/2023** | 30,000 | 7.42 | 148,312 |
| **6/20/2023** | 20,000 | 8.00 | 239,962 |
| **6/14/2023** | 30,000 | 9.04 | 271,345 |
| **6/13/2023** | 10,000 | 9.55 | 95,474 |
| **6/12/2023** | 10,000 | 8.15 | 81,487 |
| **5/19/2023** | 20,000 | 8.00 | 159,984 |
| **5/17/2023** | 40,000 | 8.17 | 326,988 |
| **5/15/2023** | 40,000 | 8.36 | 334,262 |
| **12/19/2022** | 125,000 | 9.66 | 1,207,438 |
| **6/15/2022** | 250,000 | 13.03 | 3,257,800 |
| **6/9/2022** | 250,802 | 15.49 | 3,885,097 |
| **4/22/2022** | 250,000 | 14.62 | 3,655,125 |
| **Total** | **1,275,802** | | **15,286,772** |

***Defendant Jackson***

171. While in possession of material nonpublic information, Defendant Jackson sold a total of 670,269 shares of his personally held ChargePoint stock for proceeds of over $4.6 million before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

| Date | Number of Shares Sold | Avg Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| **9/8/2023** | 556,270 | 5.84 | 3,246,279 |
| **9/21/2023** | 16,799 | 5.03 | 84,533 |
| **6/21/2023** | 16,178 | 8.03 | 129,922 |
| **3/12/2023** | 14,476 | 9.40 | 136,074 |
| **3/10/2023** | 108 | 10.16 | 1,097 |
| **12/21/2022** | 13,805 | 9.53 | 131,562 |

| | | | |
|---|---|---|---|
| **9/21/2022** | 15,005 | 16.00 | 240,065 |
| **9/12/2022** | 63 | 17.79 | 1,121.00 |
| **6/22/2022** | 7,886 | 13.63 | 107,478 |
| **3/22/2022** | 8,100 | 17.92 | 145,143 |
| **3/10/2022** | 49 | 17.47 | 856.00 |
| **12/30/2021** | 11,000 | 18.78 | 206,529 |
| **12/21/2021** | 10,530 | 18.06 | 190,172 |
| **Total** | **670,269** | | **4,620,831** |

***Defendant Wilmer***

172. While in possession of material nonpublic information, Defendant Wilmer sold a total of 33,490 shares of his personally held ChargePoint stock for proceeds of over $250,000 before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

| Date | Number of Shares Sold | Avg Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| **9/25/2023** | 8,191 | 5.03 | 41,218 |
| **6/21/2023** | 20,987 | 8.03 | 168,561 |
| **3/21/2023** | 4,312 | 9.40 | 40,533 |
| **Total** | **33,490** | | **250,312** |

***Defendant Chizen***

173. While in possession of material nonpublic information, Defendant Chizen sold a total of 120,000 shares of his personally held ChargePoint stock for proceeds of over $1.86 million before the truth emerged. These sales were timed to capitalize on ChargePoint 's artificially inflated stock price.

| Date | Number of Shares Sold | Avg Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| **10/3/2022** | 20,000 | 15.11 | 302,264 |
| **9/8/2022** | 20,000 | 16.67 | 333,381 |
| **8/1/2022** | 20,000 | 15.01 | 300,151 |
| **7/28/2022** | 20,000 | 15.09 | 301,761 |
| **6/8/2022** | 40,000 | 15.63 | 625,352 |
| **Total** | **120,000** | | **1,862,909** |

***Defendant Linse***

174. While in possession of material nonpublic information, Defendant Linse sold a total of 14,135,981 shares of his personally held ChargePoint stock for proceeds of over $144.6 million before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

| Date | Number of Shares Sold | Avg Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| **9/15/2023** | 852,085 | 5.66 | 4,823,382 |
| **9/12/2023** | 2,347,293 | 5.73 | 13,453,075 |
| **9/8/2023** | 1,473,470 | 5.75 | 8,469,842 |
| **7/13/2023** | 487,200 | 9.01 | 4,389,550 |
| **6/16/2023** | 492,360 | 8.77 | 4,317,997 |
| **6/15/2023** | 412,477 | 9.06 | 3,738,262 |
| **4/13/2023** | 1,080,162 | 8.58 | 9,267,195 |
| **1/9/2023** | 2,498,059 | 10.02 | 25,021,375 |
| **12/19/2022** | 66,803 | 9.98 | 666,714 |
| **7/8/2022** | 1,696,646 | 13.57 | 23,023,974 |
| **4/14/2022** | 1,657,967 | 15.50 | 25,690,404 |
| **12/15/2021** | 468,104 | 20.00 | 9,362,080 |
| **12/14/2021** | 31,896 | 19.93 | 635,687 |
| **12/13/2021** | 547,525 | 20.62 | 11,290,916 |
| **12/10/2021** | 23,934 | 19.96 | 477,622 |
| **Total** | **14,135,981** | | **144,628,075** |

***Defendant Singh-Bushell***

175. While in possession of material nonpublic information, Defendant Singh-Bushell sold a total of 4,622 shares of her personally held ChargePoint stock for proceeds of over $25,000 before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

| Date | Number of Shares Sold | Avg Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| **9/20/2023** | 4,622 | 5.44 | 25,144 |
| **Total** | **4,622** | | **25,144** |

176. In total, the Insider Selling Defendants sold more than 16.2 million shares of their personally-held stock for more than $166.6 million worth of ChargePoint stock at artificially inflated prices, while in possession of material, non-public information.

**DAMAGES TO CHARGEPOINT**

177. As a direct and proximate result of the Individual Defendants' misconduct, ChargePoint has incurred, and will continue to incur losses and expenses amounting to millions of dollars.

178. Such expenditures include, but are not limited to, legal fees associated with the Securities Action, as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

179. Such expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

180. Such expenditures also include, but are not limited to, costs associated with any investigation pertaining to violations of law, costs incurred in defending any investigation or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

181. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

182. As a direct and proximate result of the Individual Defendants' actions, ChargePoint has suffered and will continue to suffer damage to its reputation and goodwill, along

with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

183. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

184. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

185. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

186. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

187. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

188. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

189. The Company's Board is currently comprised of eleven members: Defendants Wilmer, Bowman, Chizen, Harries, Harris, Heystee, Leschly, Linse, Singh-Bushell, Wagoner,

and Non-Party Mitesh Dhruv. Thus, Plaintiff is only required to show that a majority of the Defendants, i.e., six, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

190. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

191. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

192. Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

***Defendant Wilmer***

193. Defendant Wilmer has served as ChargePoint's President, CEO, and a member of the Board since November 16, 2023. As the Company's CEO, Defendant Wilmer derives substantial income and other financial benefits from his employment with ChargePoint and, therefore, lacks independence for purposes of considering a demand. Moreover, as an executive officer of the Company, Defendant Wilmer does not satisfy the NYSE's bright-line independence standards, as recognized by ChargePoint.

194. As a director and senior executive, Defendant Wilmer owed fiduciary duties to ChargePoint and its stockholders, including duties relating to the oversight of the Company's affairs, public disclosures, and corporate assets. Nevertheless, Defendant Wilmer failed to exercise adequate oversight concerning the misconduct alleged herein, including the dissemination of materially false and misleading statements and omissions regarding the Company's business, operations, and prospects. In addition, during the Relevant Period and while in possession of material non-public information, Defendant Wilmer sold ChargePoint stock at allegedly artificially inflated prices and obtained substantial proceeds therefrom.

195. Accordingly, Defendant Wilmer faces a substantial likelihood of liability arising from the misconduct alleged herein, is neither disinterested nor independent with respect to a demand and therefore demand upon him is futile and excused.

***Defendants Harris, Heystee, and Singh-Bushell***

196. Defendants Harris (Chair), Heystee, and Singh-Bushell (the "Audit Committee Defendants") are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge, these Defendants caused these improper statements.

197. For these reasons, Harris(Chair), Heystee, and Singh-Bushell breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

***Defendants Wilmer, Chizen, Linse, and Singh-Bushell***

198. Defendants Wilmer, Chizen, Linse, and Singh-Bushell are not disinterested or independent and, therefore, are incapable of considering demand because while in possession of material, non-public information, they sold 33,490, 120,000, 14,135,981, and 4,622 shares of the Company's stock at various prices per share for a windfall of close to $147 million collectively, and these sales demonstrate their motives in facilitating and participating in the misleading statements. As a result of their insider selling, Wilmer, Chizen, Linse, and Singh-Bushell may be personally subject to disgorgement, and thus demand upon them is futile and, therefore, excused.

***All Directors***

199. The Directors, as members of the Board, were and are subject to the Code of Business Conduct and Ethics as well as the Company's Corporate Governance Guidelines (the "Codes"), which go well beyond the basic duties required by applicable laws, rules, and regulations. Specifically, the Codes require Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Director Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Director Defendants breached the Company's Codes, face substantial liability, and are not independent or disinterested, making demand upon them futile.

200. Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The

Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

201. ChargePoint has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ChargePoint any part of the damages ChargePoint suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

202. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

203. The acts complained of herein constitute violations of fiduciary duties owed by ChargePoint's officers and directors, and these acts are incapable of ratification.

204. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of ChargePoint. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of ChargePoint, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

205. If there is no directors' and officers' liability insurance, then the Directors will not cause ChargePoint to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

206. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### Against the Individual Defendants

207. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ChargePoint's business and affairs.

209. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

210. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of ChargePoint's shareholders.

211. In breach of their fiduciary duties owed to ChargePoint, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

212. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

213. In further breach of their fiduciary duties owed to ChargePoint, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) a material portion of ChargePoint's reported revenue was derived from undisclosed practices that violated GAAP and the Company's own revenue recognition policy, including unauthorized shipments, shipments of incomplete or incorrect products, channel stuffing through resellers, and premature software token activations; (2) as a result, the Company's reported revenue growth was not attributable to organic demand and was unsustainable; (3) ChargePoint was incurring increased component costs and supply overruns associated with its first-generation direct current ("DC")

charging products; (4) those conditions made it likely that the Company would incur impairment charges; (5) those charges and related costs would adversely affect ChargePoint's profitability; and (6) the Company maintained deficient internal controls. Accordingly, the Company's and the Individual Defendants' statements concerning ChargePoint's business, operations, and prospects were materially false and misleading when made and lacked a reasonable basis.

214. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ChargePoint's securities.

215. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

216. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate

internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ChargePoint's securities.

217. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ChargePoint has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219. Plaintiff, on behalf of ChargePoint, has no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants for Violating Section 14(a) of the Exchange Act**

220. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

221. Pursuant to Section 14(a) of the Exchange Act, "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

222. Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits proxy statements from containing "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

223. During the Relevant Period, ChargePoint solicited proxies from its stockholders by means of definitive proxy statements on Schedule 14A filed with the SEC in connection with its 2022 Annual Meeting of Stockholders, held on July 12, 2022 (the "2022 Proxy"), and its 2023 Annual Meeting of Stockholders, held on July 18, 2023 (the "2023 Proxy") (together, the "Proxies"). Each Individual Defendant then serving as a director solicited, or permitted the use of his or her name in soliciting, the Proxies.

224. By means of the 2022 Proxy, the Board solicited stockholder votes to elect Class II directors Harris, Heystee, and Wagoner; to ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm, to approve, on an advisory basis, the compensation of the Company's named executive officers, and to approve, on an advisory basis, the frequency of future advisory votes on executive compensation. By means of the 2023 Proxy, the Board solicited stockholder votes to elect directors, to ratify the appointment of PricewaterhouseCoopers LLP, and to approve, on an advisory basis, the compensation of the Company's named executive officers.

225. Each of the Proxies suggested and/or represented, among other things, that the Board and its Audit Committee were acting to discharge their responsibility to oversee the integrity of the Company's accounting and financial reporting processes, the Company's compliance with legal and regulatory requirements, and the adequacy and effectiveness of the Company's disclosure controls and procedures, that the Audit Committee had reviewed and discussed the Company's audited financial statements with management and with the

independent registered public accounting firm and had recommended their inclusion in the Company's Annual Report on Form 10-K, and that the compensation paid to the Company's named executive officers was aligned with the Company's reported financial performance.

226. Those representations were materially false and misleading, and omitted material facts necessary to make them not misleading, because at the time each Proxy was disseminated the Board and the Audit Committee were not in fact exercising the oversight the Proxies described. They permitted the Company to report revenue derived from the undisclosed practices described above, they permitted the Company to continue carrying obsolete first-generation CPE 250 inventory without timely impairment, and they permitted the dissemination of the materially false and misleading statements alleged herein. The Proxies likewise omitted that the executive compensation on which stockholders were asked to vote was tied to reported financial results that had been inflated by those undisclosed practices.

227. Had the Proxies disclosed these facts, ChargePoint's stockholders may not have voted to re-elect the incumbent directors, to ratify the selection of the Company's independent registered public accounting firm, or to approve the executive compensation paid to the Individual Defendants.

228. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

229. The false and misleading Proxy statements caused the reelection of several Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to ChargePoint.

230. As a direct and proximate result of the material misrepresentations and omissions in the Proxy Statements filed during the Relevant Period by the Individual Defendants, the Company suffered damages.

231. Plaintiff, on behalf of ChargePoint, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duty – Misappropriation of Material, Non-Public Information Against the Insider Selling Defendants

232. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233. At the time that the Insider Selling Defendants sold their ChargePoint stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

234. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold ChargePoint stock.

235. The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

236. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, any profits made by the

Insider Trading Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of constructive trust on any profits the Insider Trading Defendants obtained thereby.

**COUNT IV**

**Against the Individual Defendants for Unjust Enrichment**

237. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

238. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ChargePoint.

239. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from ChargePoint that was tied to the performance or artificially-inflated valuation of ChargePoint or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

240. Plaintiff, as a shareholder and a representative of ChargePoint, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

241. Plaintiff on behalf of ChargePoint has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for**
**Waste of Corporate Assets**

242. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

243. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

244. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, supra; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

245. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

246. Plaintiff on behalf of ChargePoint has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that the Plaintiff may maintain this action on behalf of ChargePoint and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ChargePoint;

c) Determining and awarding to ChargePoint the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve ChargePoint's corporate governance and internal procedures to comply with applicable laws and to protect ChargePoint and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2026

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
rernst@bk-legal.com

*Attorneys for Plaintiff*

OF COUNSEL:

JUSTIN A. KUEHN
MOLLY J. BROWN
**KUEHN LAW, PLLC**
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*